# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MICHAEL WALKER, on behalf of himself and all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>KONINKLIJKE PHILIPS N.V.; PHILIPS NORTH AMERICA LLC;  PHILIPS HOLDING USA INC.; and PHILIPS RS NORTH AMERICA LLC | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Michael Walker ("Plaintiff" or "Plaintiff Walker"), on behalf of himself and the class of all others similarly situated as defined below, submits his complaint against Defendants Koninklijke Philips N.V. ("Royal Philips"), Philips North America LLC ("Philips NA"), and Philips RS North America LLC ("Philips RS") (collectively, Royal Philips, Philips NA, and Philips RS are "Philips" or the "Defendants"), Philips Holding USA Inc., and alleges the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## INTRODUCTION

1.     Plaintiff brings this action on behalf of himself, and a proposed class of purchasers and users of Continuous Positive Airway Pressure (CPAP) and Bi-Level Positive Airway Pressure(Bi-Level PAP) devices and mechanical ventilators manufactured, distributed and/or sold by Philips Defendants, which contain polyester-based polyurethane sound abatement foam ("PE-PUR Foam").

2.     On April 26, 2021, Philips made a public announcement disclosing it had

determined there were risks that the PE-PUR Foam used in certain CPAP, Bi-Level PAP, and mechanical ventilator devices it manufactured may degrade or off-gas under certain circumstances.

3.    On June 14, 2021, Royal Philips issued a recall in the United States of its CPAP, Bi-Level PAP, and mechanical ventilator devices containing PE-PUR Foam, because Philips had determined that (a) the PE-PUR Foam was at risk for degradation into particles that may enter the devices' pathway and be ingested or inhaled by users, and (b) the PE-PUR Foam may off-gas certain chemicals during operation. Philips further disclosed in its Recall Notice that "these issues can result in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment."[1]

4.    Philips has disclosed that the absence of visible particles in the devices does not mean that PE-PUR Foam breakdown has not already begun. Philips reported that lab analysis of the degraded foam reveals the presence of harmful chemicals, including Toluene Diamine ("TDA"), Toluene Diisocyanate ("TDI"), and Diethylene Glycol ("DEG").

5.    Prior to issuing the Recall Notice, Philips received complaints and/or adverse notice reports regarding the presence of black debris/particles within the airpath circuit of its devices (extending from the device outlet, humidifier, tubing, and mask). Philips also received reports of headaches, upper airway irritation, cough, chest pressure and sinus infection from users of these devices.

6.    Philips's recall notice directs consumers to another link labeled "for further information" That link directs consumers to a 10-page link. Buried at the bottom of the tenth page of this link, defendants

---

[1] Medical Device Recall Notification (U.S. Only) / Fields Safety notice (Outside of U.S.)
https://www.usa.philips.com/healthcare/e/sleep/communications/src-update?_gl=1

provide the following ill health risks: Potential risks of particulate exposure to degraded foam within these devices include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects. The potential risks of chemical exposure due to off-gassing of PE-PUR Foam in these devices include headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.[2]

7.     Philips recommended that patients using the recalled CPAP and Bi-Level PAP devices immediately discontinue using their devices and that patients using the recalled ventilators for life-sustaining therapy consult with their physicians regarding alternative ventilator options.

8.     On or around November 28, 2012, Plaintiff was diagnosed with sleep apnea at Ochsner Hospital and prescribed a Respironics Dream Station CPAP machine for sleeping.

9.     On or about 3/19/2012 Plaintiff Walker purchased a Philips Respironics Dream Station Auto CPAP device, model P0525771537B9 which he has used nightly since the dateof receipt.

10.     On or about 5/23/2017 Plaintiff Walker purchased a Philips Respironics Dream Station Auto CPAP device, model J18790624d646 which he has used nightly since the date of receipt.

11.     Plaintiff Walker used his Respironics Dream Station Auto CPAP device nightly to treat a healthcondition since the date of receipt.

12.     Plaintiff received correspondence informing him that Philips had issued a recall and that he may have a device that was subject to a recall due to the presence of Polyester-based

---

[2] *Id.*

3

polyurethane (PE-PUR) sound abatement foam that could cause her to suffer from adverse health effects, including cancer and organ failure. The correspondence stated that Philips had advised patients using the recalled devices to stop using their devices and consult with their medical providers.

13.    As a result of the health risks associated with continued use of his device and the recall, Plaintiff Walker's Respironics Dream Station CPAP device is now worthless. Plaintiff Walker must now incur substantial expenses to replace the device.

14.    Plaintiff Walker will now incur substantial expenses to replace the device. In addition, Plaintiff Walker has experienced chest tightness and respiratory irritants during his use of the Philips' CPAP machine.

15.    Plaintiff Walker seeks to recover damages based on, *inter alia*, Philips' defective construction or composition, defective design, inadequate warning, breach of express warning and redhibition in connection with its manufacture, marketing and sales of devices containing PE-PUR foam on behalf of himself and the proposed Class.

## PARTIES

16.    Plaintiff Michael Walker is a citizen of the State of Louisiana.

17.    Following his sleep apnea diagnosis in 2012, Plaintiff began using Philips CPAP machines on a nightly basis, including two devices that are subject to the recall. Plaintiff used the subject devices for over 8 years prior to Philips recalling them.

18.    Defendant Koninklijke Philips N.V. ("Royal Philips") is a public limited liability company established under the laws of The Netherlands, having its principal executive offices at Philips Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands. Royal Philips is the parent company of the Philips Group of healthcare technology businesses, including Connected

Care businesses focusing on Sleep & Respiratory Care.[3] Royal Philips holds directly or indirectly 100% of its subsidiaries Philips NA and Philips RS. Upon information and belief, Royal Philips controls Philips NA and Philips RS in the manufacturing, selling, distributing, and supplying of the recalled CPAP, Bi-Level PAP, and mechanical ventilator devices.[4] Royal Philips can be served with process via the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention").

19.    Defendant Philips North America LLC ("Philips NA") is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA is a wholly owned subsidiary of Royal Philips. Upon information and belief, Philips NA manages the operation of Royal Philips' various lines of business, including Philips RS, in North America. The sole member of Philips NA is Philips Holding USA, Inc., which is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141.

20.    Defendant Philips Holding USA, Inc. ("PHUSA") is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. PHUSA is a holding company that is the sole member of Defendant Philips NA.

21.    Defendant Philips RS North America LLC ("Philips RS") is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips RS is a wholly- owned subsidiary of Royal Philips. Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips

---

[3] Philips 2020 annual filing with the SEC, fn. 8,
https://www.sec.gov/Archives/edgar/data/313216/000031321621000008/phg-exhibit8.htm (accessed July 29, 2021).
[4] Philips 2020 annual filing with the SEC,
https://www.sec.gov/ix?doc=/Archives/edgar/data/0000313216/000031321621000008/phg- 20201231.htm (accessed July 29, 2021).

acquired Respironics in 2008.

22.     Royal Philips, Philips NA, PHUSA, and Philips RS are hereinafter collectively referred to as "Philips" or the "Defendants."

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendants, and (4) there are more than 100 class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

24.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and (c) and18 U.S.C. § 1965, because Defendants transact business in this District, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District; because the plaintiff resides this District; and because the Defendants caused harm to class members residing in this District.

25.     The Court has personal jurisdiction over the Defendants because Defendants conduct substantial business in this District, and the events giving rise to Plaintiff's claims arise out of and relate to Defendants' contacts with this District. Further, Defendants have transacted business, maintained substantial contacts, purposefully targeted consumers, and medical professionals for sales of its devices and/or committed overt acts in furtherance of the unlawful acts alleged in this Complaint in this District, as well as throughout the United States. The unlawful acts of Defendants have been directed at, targeted, and have had the effect of causing

injury to persons residing in, located in, or doing business in this District, as well as throughout the United States.

## FACTUAL BACKGROUND

### I.     Continuous Positive Airway Pressure Therapy

26.     Continuous Positive Airway Pressure ("CPAP") therapy is a common nonsurgical treatment primarily used to treat sleep apnea. CPAP therapy typically involves the use of a hose and a nasal or facemask device that delivers constant and steady air pressure to an individual's throat to help individuals breathe.

27.     Sleep apnea is a common sleep disorder characterized by repeated interruptions in breathing throughout an individual's sleep cycle. These interruptions, called "apneas," are caused when the soft tissue in an individual's airway collapses. The airway collapse prevents oxygen from reaching the individual's lungs which can cause a buildup of carbon dioxide. If the individual's brain senses the buildup of carbon dioxide, it will briefly rouse the individual from sleep so that the individual's airway can reopen. Often these interruptions are so brief that the individual will not remember. Despite the brevity of the interruptions, the sleep cycle disruption caused by sleep apnea can dramatically impact a person's lifestyle, including negatively impacting energy, mental performance, and long-term health. CPAP therapy helps treat sleep apnea by preventing the person's airway from collapsing while breathing during sleep cycles, which can help prevent interruptions in breathing.

### II.     Bi-Level Positive Airway Pressure Therapy

28.     Bi-Level Positive Airway Pressure ("BiPAP") therapy is a common alternative to CPAP therapy for treating sleep apnea. Similar to CPAP therapy, BiPAP therapy is nonsurgical and involves the use of a nasal or facemask device to maintain air pressure in an

individual's airway. BiPAP therapy is distinguishable from CPAP therapy, however, because Bi-Level PAP devices deliver two alternating levels—inspiratory and expiratory—of pressurized air into a person's airway, rather than the single continuous level of pressurized air delivered by a CPAP device. The inspiratory positive airway pressure assists a person as a breath is taken in. Conversely, the expiratory positive airway pressure is applied to allow a person to comfortably breathe out. Bi-Level PAP devices deliver one level of pressurized air (the inspiratory positive level) to assist as a person inhales, and another level (the expiratory level) as a person exhales.

### III.     Mechanical Ventilation

29.     Mechanical ventilation is a treatment to help a person breathe when they find it difficult or are unable to breathe on their own. A mechanical ventilator pushes airflow into the patient's lungs to help them breathe. Mechanical ventilation may be invasive ventilation with a tube inserted into the patient's airway, performed in the intensive care unit in the hospital or a long-term institutional setting. Non-invasive ventilation can be used at home by people with respiratory difficulties.

### ALLEGATIONS

30.     Philips developed, marketed, and sold a variety of CPAP and Bi-Level PAP respirator devices and mechanical ventilators under its "Sleep & Respiratory Care" segment of its business designed to assist individuals with a number of sleep, breathing, and respiratory conditions, including obstructive sleep apnea, central sleep apnea, complex sleep apnea syndrome, and Chronic Obstructive Pulmonary Disease (COPD), as well as to assist those individuals requiring invasive and non-invasive ventilators for acute and sub-acute hospital environments. Philips' CPAP and Bi-Level PAP respirator devices and its mechanical

ventilators typically cost hundreds, if not thousands of dollars. Philips has sold millions of these devices in the United States.

## I.    Philips Sleep & Respiratory Care Devices Endangered Users

31.    Philips has utilized polyester-based polyurethane (PE-PUR) sound abatement foam to dampen device vibration and sound during routine operation.

32.    On April 26, 2021, in its Quarterly Report for Q1 2021, Philips disclosed for the first time, under a section entitled "Regulatory Update," that device user reports had led to a discovery that the type of PE-PUR Foam Philips used to minimize noise in several CPAP and Bi- Level PAP respirators and mechanical ventilators posed health risks to its users. Specifically, Philips disclosed that "the [PE-PUR] foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone, and certain environmental conditions involving high humidity and temperature."[5]

33.    Seven weeks later, on June 14, 2021, Philips announced a recall of numerous models of CPAP and Bi-Level PAP devices, as well as a variety of its mechanical ventilators "to address identified potential health risks related to the polyester-based polyurethane (PE-PUR) sound abatement foam component in these devices."[6]

34.    Specifically, Philips announced that it had determined based on lab testing and evaluations that the "PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals."[7]

---

[5] First   Quarter Results, PHILIPS (Apr.    26,    2021),   https://www.results.philips.com/ publications/q121/downloads/pdf/en/philips-first-quarter-results-2021-report.pdf (accessed July 29, 2021).
[6] *Philips issues recall notification\* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices*, PHILIPS (June 14,   2021),https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues- recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in- certain-sleep-and-respiratory-care-devices.html (accessed June 27, 2021).
[7] *Id.*

35.     According to Philips' Recall Notice, the PE-PUR Foam used in Recalled Devices puts users at risk of suffering from the following health harms: "*Particulate exposure* can cause headache, irritation [skin, eye, and respiratory tract], inflammation, respiratory issues, and possible toxic and carcinogenic effects[;]" whereas the "potential risks of *chemical exposure due to off- gassing* include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and *carcinogenic* effects."[8]

36.     Philips reported to physicians that PE-PUR Foam particles "may cause irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve."[9]

37.     Further, Philips reported that "based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment or require medical intervention to preclude permanent impairment."[10]

38.     On June 14, 2021, Philips also issued a brief report titled "Clinical Information for Physicians." In this report, Philips disclosed that "[l]ab analysis of the degraded foam reveals the presence of potentially harmful chemicals including:

    a)  Toluene Diamine

    b)  Toluene Diisocyanate

    c)  Diethylene glycol."[11]

39.     In its report titled "Clinical Information for Physicians," Philips also disclosed

---

[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*

that lab testing performed by and for Philips has also identified the presence of Volatile Organic Compounds (VOCS) which may be emitted from the sound abatement foam component of the affected devices. "VOCs are emitted as gases from the foam included in the [affected devices] and may have short- and long-term adverse health effects. Standard testing identified two compounds of concern may be emitted from the foam that are outside of safety thresholds. The compounds identified are the following:

    a) Dimethyl Diazine

    b) Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)-"[12]

### II. Philips' Recalled Devices ("Recalled Devices")

40.    In total, Philips announced that "between 3 million and 4 million" devices are targeted in the recall.[13]

41.    The List of the devices recalled by Phillips (the "recalled devices") include:

### Philips CPAP and Bi-Level PAP Devices[14]

| Device Name/Model Type | Type |
|---|---|
| E30 (Emergency Use Authorization) | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| DreamStation ASV | Continuous Ventilator, Non-life Supporting |
| DreamStation ST, AVAPS | |
| SystemOne ASV4 | |
| C Series ASV | |
| C Series S/T and AVAPS | |
| OmniLab Advanced Plus | |
| SystemOne (Q Series) | Non-continuous Ventilator |
| DreamStation | |
| DreamStation GO | |

[12] *Id.*
[13] Associated Press, *Philips recalls ventilators, sleep apnea machines due to health risks*, NBC NEWS, https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea- machines-due-health-risks-%20n1270725 (accessed July 29, 2021).
[14] Recall Notice (https://www.usa.philips.com/healthcare/e/sleep/communications/src-update/information-for-physicians-and-providers) (Exhibit "A" hereto); *see also* Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS (July 29, 2021),

| | |
|---|---|
| Dorma 400 | |
| Dorma 500 | |
| REMStar SE Auto | |

| Philips Mechanical Respirator Devices Manufactured Before April 26, 2021 Subject to Recall[15] | |
|---|---|
| Device Name/Model Type | Type |
| Trilogy 100 Ventilator | Continuous Ventilator |
| Trilogy 200 Ventilator | |
| Garbin Plus, Aeris, LifeVentVentilator | |
| A-Series BiPAP Hybrid A30 | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| Philips A-Series BiPAP V30 Auto | |
| Philips A-Series BiPAP A40 | Continuous Ventilator, Non-life Supporting |
| Philips A-Series BiPAP A30 | |

### III.    The Health Risks Associated with Use of the Recalled Devices Renders Them Worthless

42.    As a result of the health risks associated with the use of the Recalled Devices, together with Defendants' concealment of these risks from the date they were first reported to Defendants or discovered by Defendants through April 26, 2021, the Recalled Devices have been rendered completely worthless, or at the very least, have been substantially diminished in value.

43.    The information described above, including the now-known health risks of Philips CPAP devices, Bi-Level PAP devices and mechanical ventilators, the recall, and the medical warnings and advice issued by Philips, have rendered the Recalled Devices worthless to patients with sleep apnea and respiratory conditions. Individuals not using life-supporting ventilators must immediately discontinue their user of the Recalled Devices or face serious

---

[15] *Id.*

health risks as grave as organ failure or cancer. If they choose to discontinue use of the Recalled Devices, they must pay for another expensive device in order to receive effective treatment for their sleep apnea and/or respiratory conditions. Individuals using life-supporting ventilators must seek an alternative treatment before discontinuing use of the Recalled Devices.

44.    Recognizing this, Philips issued the following advice to patients using any of the Recalled Devices:

    a) "For patients using BiLevel PAP and CPAP devices: Discontinue use of affected units and consult with physicians to determine the benefits of continuing therapy and potential risks."[16]

    b) "For patients using life-sustaining mechanical ventilator devices: DO NOT discontinue or alter prescribed therapy, without consulting physicians to determine appropriate next steps."[17]

45.    As a result of the above, Plaintiff and the Class and Subclass will have to undertake considerable expense replacing the Recalled Devices.

**IV.    Philips Unreasonably Delayed Its Recall**

46.    At no time prior to its Regulatory Update on April 26, 2021, did Philips disclose to purchasers or users of the Recalled Devices that the PE-PUR Foam contained therein may off-gas or degrade upon use. Similarly, prior to the recall, Philips did not disclose any health risks associated with use of the Recalled Devices.

47.    Defendants have not disclosed when they first discovered or received reports from users of their Sleep & Respiratory Care devices "regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing,

---

[16] *Id.*
[17] *Id.*

and mask)."[18]

48.     At a minimum, as a result of user reports, Defendants were aware of the off-gassing and degradation of the PE-PUR Foam used in the Recalled Devices at some point prior to the recall yet continued to manufacture and sell the Recalled Devices with such knowledge. During this period, Defendants unreasonably and unjustly profited from the manufacture and sale of the Recalled Devices and unreasonably put users of the Recalled Devices at risk of development of serious adverse health effects, including organ failure and cancer.

### V. Plaintiff Michael Walker

49.     Plaintiff Michael Walker is a resident and citizen of Marrero, LA.

50.     Plaintiff Walker purchased two of the recalled devices prior to June 14, 2021.

51.     The manuals accompanying the subject devices did not contain any language or warnings of health risks associated with the use of the device, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects. Had Defendants informed Plaintiff of these risks, he would not have purchased or used the Recalled Devices.

52.     Without knowing of the health risks associated with use of the Recalled Devices, Plaintiff Walker used his Recalled devices regularly to treat his sleep apnea.

53.     As a result of the health risks associated with continued use of these devices and the recall, Plaintiff's CPAP devices are now worthless. Plaintiff Walker will be forced to replace the device at considerable cost when a replacement is available.

### TOLLING AND ESTOPPEL

### I.   DISCOVERY RULE TOLLING

---

[18] Recall Notice (Exhibit "A" hereto).

54.    Plaintiff and the Class and Subclass had no way of knowing about Philips' conduct with respect to the health risks associated with the use of the Recalled Devices, until the Recall at the earliest date.

55.    Neither Plaintiff nor any other members of the Class or Subclass, through the exercise of reasonable care, could have discovered the conduct by Philips alleged herein. Further, Plaintiff and members of the Class and Subclass did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

56.    For these, reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiff, the Class, and Subclass.

## II. FRAUDULENT CONCEALMENT TOLLING

57.    By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiff and the members of the Class and Subclass.

58.    Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiff and members of the Class and Subclass. Plaintiff and the members of the Class and Subclass were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiff or members of the Class or Subclass should be tolled.

## CORPORATE/VICARIOUS LIABILITY

59.    At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of each of the other Defendants

herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their collective conduct constituted a breach of duty owed to the Plaintiff.

60.    There exists and, at all times herein mentioned, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

61.    At all times herein mentioned, Defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by the Plaintiff. As such, each Defendant is individually, as well as jointly and severally, liable to the Plaintiffs for their damages.

62.    At all times herein mentioned, the officers and/or directors of the Defendants named herein participated in, authorized and/or directed the production and promotion of the aforementioned products when they knew, or with the exercise of reasonable care and diligence should have known, of the hazards and dangerous propensities of said products, and thereby actively participated in the tortious conduct that resulted in the injuries suffered by the Plaintiffs.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). Plaintiff seeks class certification on behalf of a Louisiana economic class defined as follows (the "Class"):

> **NATIONWIDE CLASS**: All persons in the United States who purchased or used a CPAP, Bi-Level PAP, or Mechanical Ventilator device that was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

64.     Plaintiff seeks certification on behalf of a subclass defined as follows (the "Subclass"):

> **LOUISIANA CLASS**: All persons who were or are citizens of the State of Louisiana who purchased a CPAP, Bi-Level PAP, or Mechanical Ventilator device that was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

65.     Plaintiff reserves the right to modify or refine the definitions of the Class or Subclass based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

66.     Excluded from the Class and Subclass are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants' and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendants or their parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class or Subclass; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiff and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

67.    **Numerosity (Rule 23(a)(1)).** The class and subclass are so numerous that joinder of individual members herein is impracticable. The exact number of members of the Class and Subclass, as herein identified and described, is not known, but sales figures and the Recall Notice indicate that millions of individuals have purchased the Recalled Devices.

68.    **Commonality (Rule 23(a)(2)).** Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

a.    whether Defendants owed a duty of care to Plaintiff and the Class and Subclass;

b.    whether Defendants knew or should have known that the PE-PUR Foam used for sound abatement posed health risks;

c.    whether Defendants wrongfully represented that the PE-PUR Foam used for sound abatement in the Recalled Devices was safe;

d.    whether the Recalled Devices retained any value post-recall;

e.    whether Defendants wrongfully represented that the Recalled Devices were safe to use;

f.    whether Defendants wrongfully failed to disclose that the PE-PUR Foam used for sound abatement in the Recalled Devices posed health risks to Recalled Device users;

g.    whether Defendants' representations and omissions in advertising, warranties, packaging, and/or labeling were false, deceptive, and/or misleading;

h.    whether those representations and omissions were likely to deceive a reasonable consumer;

i.     whether a reasonable consumer would consider the presence, or risk of, health risks as a material fact in purchasing one of the Recalled Devices;

j.     whether Defendants had knowledge that those representations and omissions were false, deceptive, and misleading;

k.     whether Defendants breached their express warranties;

l.     whether Defendants breached their implied warranties;

m.     whether Defendants engaged in unfair trade practices;

n.     whether Defendants engaged in false advertising;

o.     whether Defendants' conduct was negligent per se;

p.     whether Defendants made negligent and/or fraudulent misrepresentations and/or omissions; and

q.     whether Plaintiff and the members of the Class and Subclass are entitled to actual, statutory, and punitive damages.

69.     **Typicality (Rule 23(a)(3)).** Plaintiff's claims are typical of the claims of the other members of the proposed Class and Subclass. Plaintiff and members of the Class and Subclass (as applicable) suffered injuries as a result of Defendants' wrongful conduct that is uniform across the Class and Subclass.

70.     **Adequacy (Rule 23(a)(4)).** Plaintiff's interests are aligned with the Class and Subclass he seeks to represent. Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class and Subclass. Plaintiff has retained competent counsel highly experienced in complex litigation and class actions and the types of claims at issue in this litigation, with the necessary resources committed to protecting the interests of the Class and

Subclass. Plaintiff has no interest that is antagonistic to those of the Class and Subclass, and Defendants have no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclass. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of the other members of the Class and Subclass.

71.    **Superiority**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class and Subclass is impracticable. The prosecution of separate actions by individual members of the Class and Subclass would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class and Subclass, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Class treatment will create economies of time, effort, and expense and promote uniform decision- making.

72.    **Manageability.** This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

73.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF
## FOR NATIONAL CLASS ACTION and
## SUB-CLASS ACTION
## COUNT I

### BREACH OF EXPRESS WARRANTY
### (On behalf of the Class or, alternatively, the Subclass)

74.    Plaintiff incorporates the foregoing factual allegations as if fully set forth herein.

75.    Philips marketed and sold the Recalled Devices into the stream of commerce with the intent that the Recalled Devices would be purchased by Plaintiff and the Class and Subclass.

76.    Philips expressly warranted, advertised, and represented to Plaintiff and the Class and Subclass that the Recalled Devices were safe and appropriate for human use.

77.    Philips made these express warranties regarding the Recalled Devices' quality and fitness for use in writing through its website, advertisements, and marketing materials, and on the Recalled Devices' packaging and labels. These express warranties became part of the basis of the bargain that Plaintiff and the Class and Subclass entered into upon purchasing the Recalled Devices.

78.    Philips' advertisements, warranties, representations, and omissions regarding health risks associated with the Recalled Devices, were made in connection with the sale of the Recalled Devices to Plaintiff and the Class and Subclass. Plaintiff and the Class and Subclass relied on Philips' advertisements, warranties, representations, and omissions regarding the Recalled Devices in deciding whether to purchase and use Philips' Recalled Devices.

79.    Philips' Recalled Devices do not conform to Philips' advertisements, warranties, representations, and omissions in that they are not safe, healthy, and appropriate for human use, and pose risks of serious injury and disease, including organ failure and cancer.

80.    Philips therefore breached its express warranties by placing Recalled Devices into the stream of commerce and selling them to consumers, when their use posed health risks, had dangerous effects and were unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Philips. These associated health effects substantially impair the use, value, safety of the Recalled Devices, and render them worthless.

81.    Philips was aware, or should have been aware, of the toxic or dangerous health effects of the use of the Recalled Devices, but nowhere on the package labeling or package inserts or on Philips' websites or other marketing materials did Philips warn Plaintiff and members of the Class and Subclass that they were at risk of developing adverse health effects as a result of the dangerous PE-PUR Foam used in the Recalled Devices.

82.    Instead, Philips concealed the dangerous health effects of the PE-PUR Foam used in the Recalled Devices and deceptively represented that these products were safe, healthy, and appropriate for use. Philips thus utterly failed to ensure that the material representations they were making to consumers were true.

83.    The adverse health effects associated with use of the Recalled Devices existed when they left Philips' possession or control and were sold to Plaintiff and members of the Class and Subclass. The dangers associated with use of the Recalled Devices were undiscoverable by Plaintiff and members of the Class and Subclass at the time of purchase of the Recalled Devices.

84.    As manufacturers, marketers, advertisers, distributors and sellers of the Recalled Devices, Philips had exclusive knowledge and notice of the fact that the Recalled Devices did not conform to the affirmations of fact and promises.

85.    In addition, or in the alternative, to the formation of an express contract, Philips made each of the above-described representations and omissions to induce Plaintiff and members of the Class and Subclass to rely on such representations and omissions.

86.    Philips' affirmations of fact and promises and its omissions were material, and Plaintiff and members of the Class and Subclass reasonably relied upon such representations and omissions in purchasing and using the Recalled Devices.

87.    All conditions precedent to Philips' liability for its breach of express warranty have been performed by Plaintiff or members of the Class or Subclass.

88.    Affording Philips an opportunity to cure its breaches of written warranties would be unnecessary and futile here. Philips was placed on reasonable notice from user reports and its lab testing that the PE-PUR Foam in the Recalled Devices was unsafe. Philips had ample opportunity either to stop using the PE-PUR Foam or to replace the PE-PUR Foam in the Recalled Devices to make them safe and healthy for use by Plaintiff and members of the Class and Subclass but failed to do so until now.

89.    As a direct and proximate result of Philips' breaches of express warranty, Plaintiff and members of the Class and Subclass have been damaged because they did not receive the products as specifically warranted by Philips. Plaintiff and members of the Class and Subclass did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for the Recalled Devices.

90.    Plaintiff and the Class and Subclass seek actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their express warranties and resulting breach.

## COUNT II

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (On behalf of the Class or, alternatively, the Subclass)

91.     Plaintiff incorporates the foregoing factual allegations as if fully set forth herein.

92.     Philips are merchants engaging in the sale of goods to Plaintiff and the Class and Subclass.

93.     There was a sale of goods from Philips to Plaintiff and to each member of the Class and Subclass.

94.     At all times mentioned herein, Philips manufactured or supplied the Recalled Devices, and prior to the time the Recalled Devices were purchased by Plaintiff and the Class and Subclass, Philips impliedly warranted to them that the Recalled Devices were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact and omissions made on the Recalled Devices' labels and packaging, including that the Recalled Devices were safe and appropriate for human use. Plaintiff and the Class and Subclass relied on Philips' promises and affirmations of fact and omissions when they purchased and used the Recalled Devices.

95.     Contrary to these representations and warranties, the Recalled Devices were not fit for their ordinary use and did not conform to Philips' affirmations of fact and promises and omissions because use of the Recalled Devices is accompanied by the risk of adverse health effects, which does not conform to the labels and packaging of these devices.

96.     Philips breached its implied warranties by selling Recalled Devices that failed to conform to the promises or affirmations of fact made on the packaging or label, as use of each Recalled Devices was accompanied by the risk of developing adverse health effects that do not conform to the packaging or label.

97.    Philips was on notice of this breach, as it was made aware of the adverse health effects accompanying use of the Recalled Devices through user reports submitted to Philips and through lab testing.

98.    Privity exists because Philips impliedly warranted to Plaintiff and the Class through the warranting, packaging, advertising, marketing, and labeling that the Recalled Devices were natural, and suitable for use to treat health conditions, and made no mention of the attendant health risks associated with use of the Recalled Devices.

99.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class and Subclass have suffered actual damages in that each recalled device they purchased is worth less than the price they paid and which they would not have purchased at all had they known of the attendant health risks associated with the use of each recalled device.

100.    Plaintiff and the Class and Subclass seek actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their implied warranties and resulting breach.

## COUNT III

### FRAUDULENT MISREPRESENTATION
**(On behalf of the Nationwide Class or, alternatively, the Subclass)**

101.    Plaintiff incorporates the foregoing factual allegations as if fully set forth herein.

102.    Philips failed to advise Plaintiff and the Class and Subclass that the Recalled Devices posed serious health risks to their users and Philips falsely represented to Plaintiff and the Class and Subclass that the Recalled Devices were safe for human use.

103.    Philips intentionally, knowingly, and recklessly made these misrepresentations and omissions to induce Plaintiff and the Class and Subclass to purchase the Recalled Devices.

104.    Philips knew that its representations and omissions about the Recalled Devices were false in that the Recalled Devices contained PE-PUR Foam and thus were at risk of causing adverse health effects to users of the Recalled Devices, which does not conform to the products' labels, packaging, advertising, and statements. Philips knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, including Plaintiff and the Class and Subclass.

105.    Plaintiff and the Class and Subclass did in fact rely on these omissions and misrepresentations and purchased and used the Recalled Devices to their detriment. Given the deceptive manner in which Philips advertised, represented, and otherwise promoted the Recalled Devices, Plaintiff's and the Class' and Subclass' reliance on Philips' omissions and misrepresentation was justifiable.

106.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class and Subclass have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, and (c) which did not conform to the Recalled Devices' labels, packaging, advertising, and statements.

107.    Plaintiff and the Class and Subclass seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT IV

### FRAUD BY OMISSION
### (On behalf of Nationwide Class or, alternatively, the Subclass)

108.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

109.    Philips concealed from and failed to disclose to Plaintiff and the Class and Subclass that use of Recalled Devices is accompanied by a risk of adverse health effects, which does not conform to the products' labels, packaging, advertising, and statements.

110.    Philips was under a duty to disclose to Plaintiff and the Class and Subclass the true quality, characteristics, ingredients and suitability of the Recalled Devices because: (a) Philips was in a superior position to know the true state of facts about its products; (b) Philips was in a superior position to know the risks associated with the use of, characteristics of, and suitability of the Recalled Devices for use by individuals; and (c) Philips knew that Plaintiff and the Class and Subclass could not reasonably have been expected to learn or discover prior to purchasing the Recalled Devices that there were misrepresentations and omissions by Philips in the packaging, labels, advertising, and websites regarding the health risks associated with use of these devices

111.    The facts concealed or not disclosed by Philips to Plaintiff and the Class and Subclass were material in that a reasonable consumer would have considered them important when deciding whether to purchase the Recalled Devices.

112.    Plaintiff and the Class and Subclass justifiably relied on Philips' omissions to their detriment. The detriment is evident from the true quality, characteristics, and risk associated with the use of the Recalled Devices, which is inferior when compared to how the Recalled Devices are advertised and represented by Philips.

113.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class and Subclass have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had

they known of the health risks associated with the use of the Recalled Devices, and (c) which do not conform to the Recalled Devices' labels, packaging, advertising, and statements.

114.    Plaintiff and the Class and Subclass seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT V

### NEGLIGENT MISREPRESENTATION
**(On behalf of the Nationwide Class or, alternatively, the Subclass)**

115.    Plaintiff incorporates the foregoing factual allegations as if fully set forth herein.

116.    Philips had a duty to Plaintiff and the Class and Subclass to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of the Recalled Devices.

117.    Philips breached its duty to Plaintiff and the Class by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiff and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Philips and by failing to promptly remove the Recalled Devices from the marketplace or to take other appropriate remedial action upon becoming aware of the health risks of the Recalled Devices.

118.    Philips knew or should have known that the qualities and characteristics of the Recalled Devices were not as advertised or suitable for their intended use and were otherwise not as warranted and represented by Philips. Specifically, Philips knew or should have known that:

   a)   the use of the Recalled Devices was accompanied by risk of adverse health effects that do not conform to the packaging and labeling;

28

b) the Recalled Devices were adulterated, or at risk of being adulterated, by the PE-PUR Foam; and

c) the Recalled Devices were otherwise not as warranted and represented by Philips.

119. As a direct and proximate result of Philips' conduct, Plaintiff and the Class and Subclass have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known they contained PE-PUR Foam that could cause users of the Recalled Devices to suffer adverse health effects, and (c) which do not conform to the products' labels, packaging, advertising, and statements.

120. Plaintiff and the Class and Subclass seek actual damages, attorneys' fees, costs, and any other just and proper relief available.

## COUNT VI

### UNJUST ENRICHMENT
**(On behalf of the Nationwide Class or, alternatively, the Subclass)**

121. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

122. Plaintiff and the Class and Subclass conferred substantial benefits on Philips through their purchase of the Recalled Devices. Philips knowingly and willingly accepted and enjoyed these benefits.

123. Philips either knew or should have known that the payments rendered by Plaintiff and the Class and Subclass were given with the expectation that the Recalled Devices would have the qualities, characteristics, and suitability for use represented and warranted by Philips. As such, it would be inequitable for Philips to retain the benefit of the payments under these circumstances.

124.    Philips' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Philips to retain the benefits without payment of the value to Plaintiff and the Class and Subclass.

125.    Plaintiff and the Class and Subclass are entitled to recover from Philips all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

126.    Plaintiff and the Class and Subclass seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT VII

### VIOLATION OF THE MAGNUNSON-MOSS WARRANTY ACT
### 15 U.S.C. §§ 2301, et seq.

127.    Plaintiff, individually and for the Class, hereby incorporates each and every allegation as though fully set forth herein

128.    Plaintiff and members of the Class are "consumers" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(3).

129.    Defendant Philips is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(4) and (5).

130.    The Subject Devices are "consumer products" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(6).

131.    Philips impliedly warranted that the Subject Devices would be free of defects at the time of delivery, and the Subject Devices had an implied warranty of merchantability.

132.    Philips breached its warranties by offering for sale and selling Subject Devices that were by design and construction defective and unsafe, thereby subjecting Class members who purchased or leased the Subject Devices to damages and

risks of loss and injury.

133. Philips has breached and continues to breach its written and implied warranties of safety, thereby damaging Plaintiff and similarly situated Class members, when their Subject Devices fail to perform as represented due to an undisclosed Defect.

134. As a result of Philips' continued breach of its warranties, Plaintiff has suffered damages.

135. Plaintiff and the Class seek full compensatory and consequential damages allowable by law, appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Philips' wrongful acts and practices, restitution, attorney's fees and costs, and any other relief to which Plaintiff and the Class may be entitled.

136. Therefore, Plaintiff prays for relief as set forth below.

## ADDITIONAL CLAIMS FOR RELIEF
## FOR SUB-CLASS ACTION

### COUNT VIII
### REDHIBITION

137. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

138. The Recalled Device contains a vice or defect which renders it useless or its use so inconvenient that buyers would not have purchased it.

139. Philips sold and promoted the DreamStation Auto CPAP device, which Philips placed into the stream of commerce. Under Louisiana law, the seller warrants the buyer against redhibitory defects, or vices, in the thing sold. La. C.C. art. 2520. The Recalled Device, sold and promoted by Philips, possesses a

redhibitory defect because it was not manufactured and marketed in accordance with industry standards and/or is unreasonably dangerous, as described above, which renders the subject product useless or so inconvenient that it must be presumed that a buyer would not have bought the subject product had he known of the defect. Pursuant to La. C.C. art. 2520, Plaintiff and members of the Class are entitled to obtain a rescission of the sale of the Recalled Devices.

140.    The DreamStation Auto CPAP device alternatively possesses a redhibitory defect because the Recalled Device was not manufactured and marketed in accordance with industry standards and/or is unreasonably dangerous, as described above, which diminishes the value of the Recalled Device so that it must be presumed that a buyer would still have bought it but for a lesser price. In this instance, Plaintiff and members of the Class are entitled to a reduction of the purchase price of the Recalled Devices.

141.    Philips is liable as a bad faith seller for selling a defective product with knowledge of the defect, and thus, are liable to Plaintiff for the price of the DreamStation Auto CPAP device, with interest from the purchase date, as well as reasonable expenses occasioned by the sale of the DreamStation Auto CPAP device, and attorneys' fees. As the manufacturer of the DreamStation Auto CPAP device, under Louisiana law, Philips is deemed to know that the Recalled Device possessed a redhibitory defect. La. C.C. art. 2545.

142.    As a result of the DreamStation Auto CPAP device's redhibitory defects, Plaintiff and members of the Class have suffered actual damages in that each Recalled Device they purchased is worth less than the price they paid and which

they would not have purchased at all had they known of the attendant health risks associated with the use of each Recalled Device.

143.    By reason of the foregoing, Plaintiff and the Class seek actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for the Recalled Devices' redhibitory defects.

## COUNT IX

### CONSTRUCTION OR COMPOSITION DEFECT
### UNDER LA R.S. 9:2800.55 (PRODUCTS LIABILITY)

144.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

145.    In the alternative, Plaintiff and members of the Class assert they are entitled to relief and recovery under the LPLA for Philips' defective construction or composition.

146.    At all times material to this action, Philips was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling the Recalled Devices, including the DreamStation Auto CPAP device.

147.    At all times material to this action, the Recalled Devices were expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Plaintiff and the Class herein without substantial change in the condition in which it was sold.

148.    At all times material to this action, the DreamStation Auto CPAP device was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Philips in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in

ways which include, but are not limited to, one or more of the following particulars:

a)  When placed in the stream of commerce, the Recalled Device contained manufacturing defects which rendered the subject product unreasonably dangerous;

b)  The Recalled Device's manufacturing defects occurred while the product was in the possession and existed before it left the control of Philips; and

c)  The Recalled Device was not made in accordance with Philips' specifications or performance standards.

149.  Philips knew or should have known of the defective nature of the Recalled Devices, including the DreamStation Auto CPAP device used by Plaintiff, including (among other things), that the PE-PUR foam used in the Recalled Devices' component parts was prone to flaking, chemicalization, disintegration, that it could enter the user's airways while they slept, exposing them to increased and unnecessary risk of cancer, as well as other injuries.

150.  The DreamStation Auto CPAP device manufactured by Philips was defective in construction or composition in that, when it left the hands of Philips, it deviated in a material way from Philips' manufacturing performance standards and/or it differed from otherwise identical products manufactured to the same design formula. In particular, the product is not safe, has numerous and serious side effects and causes severe and permanent injuries. The product was unreasonably dangerous in construction or composition as provided by La. R.S. 9:2800.55.

151.  As a direct and proximate result of Philips' conduct, Plaintiff and members of the Class have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, and (c) which did not conform to the Philips' manufacturing performance standards and/or otherwise identical products' standards.

152.  By reason of the foregoing, Plaintiff and members of the Class have suffered damages as alleged herein.

## COUNT X

## DESIGN DEFECT UNDER L.A. R.S. 9:2800.56 (PRODUCTS LIABILITY)

153.  Plaintiff incorporates the foregoing allegations as if fully set forth herein.

154.  In the alternative, Plaintiff and members of the Class assert they are entitled to relief and recovery under the LPLA for Philips' defective design.

155.  The DreamStation Auto CPAP is defective in its design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation. The subject product was unreasonably dangerous in design as provided by La. R.S. 9:2800.56.

156.  At all times material to this action, the DreamStation Auto CPAP was expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Plaintiff and the Class herein, without substantial change in the condition in which it was sold.

157.    The Recalled Devices, including the DreamStation Auto CPAP device used by
Plaintiff, was not reasonably safe for its intended uses and was defective with
respect to its design. The DreamStation Auto CPAP device's design defects
include, but are not limited to:

d)    The use of polyurethane PE-PUR sound abatement foam in the Recalled Devices,
including the DreamStation Auto CPAP device and the immune reaction that
results from such material, causing adverse reactions and injuries;

e)    Failing to design the Recalled Devices so as to avoid an unreasonable and
increased risk of harm of cancer and other injuries in users;

f)    Including in the design of the Recalled Devices, flawed polyurethane PE-PUR
sound abatement foam that could break down, flake off and/or chemicalize and
infiltrate the device's air pathway while the user is sleeping, exposing them to
increased and unnecessary risk of cancer, as well as other injuries;

g)    Failing to use alternatively available sound abatement materials and/or foams in
the Recalled Devices, such as plastic, silicone, or rubber, which would not
break down, flake off and/or chemicalize and infiltrate the device's air pathway
while the user is sleeping;

h)    Otherwise negligently or carelessly designing, manufacturing, marketing,
labeling, packaging and/or selling the Recalled Devices.

158.    At all times, the use of the Recalled Devices, as well as Plaintiff's use of the
DreamStation Auto CPAP device, was foreseeable and foreseen by Philips as
it was used by Plaintiff in the manner intended by Philips.

159.    The DreamStation Auto CPAP device designed, researched, manufactured,

tested, advertised, promoted, marketed, sold, and distributed by Philips was defective in design and/or formulation, in that, when it left the hands of the Philips, manufacturers, and/or suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

160. At all times herein mentioned, the DreamStation Auto CPAP device was in a defective condition and unsafe, and Philips knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Philips.

161. Philips, with this knowledge, voluntarily designed the DreamStation Auto CPAP device in a dangerous condition for use by the public, and in particular the Plaintiff.

162. Philips had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

163. Philips created a product unreasonably dangerous for its normal, intended use.

164. The DreamStation Auto CPAP device, designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Philips, was manufactured defectively in that the DreamStation Auto CPAP device left the hands of Philips in a defective condition and was unreasonably dangerous to its intended users.

165. The DreamStation Auto CPAP device, designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Philips reached their intended users in the same defective and unreasonably dangerous condition in which it was manufactured.

166. In addition, at the time the DreamStation Auto CPAP device left the control of Philips, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of Plaintiff's injuries without impairing the reasonably anticipated or intended function of the product. These safer alternative designs were economically and technologically feasible and would have prevented or significantly reduced the risk of Plaintiff's injuries without substantially impairing the product's utility.

167. The Plaintiff could not, by the exercise of reasonable care, have discovered the DreamStation Auto CPAP device's defects herein mentioned and perceived its danger.

168. As a direct and proximate result of Philips' conduct Plaintiff and the class have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks, including organ failure and cancer associated with the use of the recalled devices, and (c) which were defective and unsafe.

169. By reason of the foregoing, Plaintiff and the Class have suffered damages as alleged herein.

## COUNT XI

### INADEQUATE WARNING UNDER L.A. R.S. 9:2800.57 (PRODUCTS LIABILITY)

170. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

171. In the alternative, Plaintiff and members of the Class assert they are entitled to relief and recovery under the LPLA for Philips' inadequate warning.

38

172.   The DreamStation Auto CPAP device was defective and unreasonably dangerous
when it left the possession of the Philips in that it contained warnings
insufficient to alert consumers, including Plaintiff herein, and her health care
providers, of the dangerous risks and reactions associated with the subject
product, including but not limited to its propensity to cause permanent physical
injuries and side effects, notwithstanding the Philips' knowledge of an
increased risk of these injuries and side effects. Thus, the subject product was
unreasonably dangerous because an adequate warning was not provided as
provided pursuant to La. R.S. 9:2800.57.

173.   The DreamStation Auto CPAP device manufactured and supplied by Philips was
defective due to inadequate post-marketing warning or instruction because,
after Philips was placed on reasonable notice from user reports and its lab
testing that the PE-PUR Foam in the Recalled Devices was unsafe, Philips
failed to provide an adequate warning to consumers and/or their federal and/or
state requirements for labeling, warnings and instructions, or recall, while
knowing that the product could cause serious injury.

174.   Plaintiff was prescribed and used the DreamStation Auto CPAP device for its
intended purpose.

175.   Plaintiff could not have discovered any defect in the subject product through the
exercise of reasonable care.

176.   As manufacturers, marketers, advertisers, distributors and sellers of the Recalled
Devices, Philips had exclusive knowledge and notice of the fact that the
warnings were not accurate, clear and/or were ambiguous.

177.   Philips' warnings and its omissions were material, and Plaintiff and members of the Class reasonably relied upon such representations and omissions in purchasing and using the Recalled Devices.

178.   Philips had a continuing duty to warn Plaintiff of the dangers associated with the subject product.

179.   Had Plaintiff received adequate warnings regarding the risks of the subject product, he would not have purchased it.

180.   As a direct and proximate result of Philips' conduct, Plaintiff and the Class have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which labels, warnings, and packaging did not provide an adequate warning of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, and (c) which they would not have purchased at all had they been warned of these health risks.

181.   By reason of the foregoing, Plaintiff and the Class have suffered damages as alleged herein.

**COUNT XII**

**BREACH OF EXPRESS WARRANTY UNDER L.A. R.S. 9:2800.58
(PRODUCTS LIABILITY)**

182.   Plaintiff incorporates the foregoing allegations as if fully set forth herein.

183.   In the alternative, Plaintiff and members of the Class assert they are entitled to relief and recovery under the LPLA for Philips' breach of express warranty.

184.   At all times material to this action, the Recalled Devices were expected to reach, and did reach, consumers in the State of Louisiana, including Plaintiff and the

members of the Class herein without substantial change in the condition in which it was sold.

185.  Philips expressly warranted, advertised, and represented to Plaintiff and the Class that the Recalled Devices were safe and appropriate for human use.

186.  Philips made these express warranties regarding the Recalled Devices' quality and fitness for use in writing through its website, advertisements, and marketing materials, and on the Recalled Devices' packaging and labels. These express warranties became part of the basis of the bargain that Plaintiff and the Class entered into upon purchasing the Recalled Devices.

187.  Philips' advertisements, warranties, representations, and omissions regarding health risks associated with the Recalled Devices, were made in connection with the sale of the Recalled Devices to Plaintiff and the Class. Plaintiff and the Class relied on Philips' advertisements, warranties, representations, and omissions regarding the Recalled Devices in deciding whether to purchase and use Philips' Recalled Devices.

188.  Philips' Recalled Devices do not conform to Philips' advertisements, warranties, representations, and omissions in that they are not safe, healthy, and appropriate for human use, and pose risks of serious injury and disease, including organ failure and cancer.

189.  Philips therefore breached its express warranties under La. R.S. 9:2800:58 by placing Recalled Devices into the stream of commerce and selling them to consumers, when their use posed health risks, had dangerous effects and were unsafe, rendering these products unfit for their intended use and purpose, and

unsafe and unsuitable for consumer use as marketed by Philips. These associated health effects substantially impair the use, value, safety of the Recalled Devices, and render them worthless.

190.  Philips was aware, or should have been aware, of the toxic or dangerous health effects of the use of the Recalled Devices, but nowhere on the package labeling or package inserts or on Philips' websites or other marketing materials did Philips warn Plaintiff and members of the Class that they were at risk of developing adverse health effects as a result of the dangerous PE- PUR Foam used in the Recalled Devices.

191.  Instead, Philips concealed the dangerous health effects of the PE-PUR Foam used in the Recalled Devices and deceptively represented that these products were safe, healthy, and appropriate for use, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for sleep apnea, that the side effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use. Philips thus utterly failed to ensure that the material representation they were making to consumers were true.

192.  The adverse health effects associated with use of the Recalled Devices existed when they left Philips' possession or control and were sold to Plaintiff and members of the Class. The dangers associated with use of the Recalled Devices were undiscoverable by Plaintiff and members of the Class at the time of purchase of the Recalled Devices.

193.  As manufacturers, marketers, advertisers, distributors and sellers of the Recalled

Devices, Philips had exclusive knowledge and notice of the fact that the Recalled Devices did not conform to the affirmations of fact and promises.

194.   In addition, or in the alternative, to the formation of an express contract, Philips made each of the above-described representations and omissions to induce Plaintiff and members of the Class to rely on such representations and omissions.

195.   Philips' affirmations of fact and promises and its omissions were material, and Plaintiff and members of the Class reasonably relied upon such representations and omissions in purchasing and using the Recalled Devices.

196.   All conditions precedent to Philips' liability for its breach of express warranty have been performed by Plaintiff or members of the Class.

197.   Philips was placed on reasonable notice from user reports and its lab testing that the PE-PUR Foam in the Recalled Devices was unsafe. Philips had ample opportunity either to stop using the PE-PUR Foam or to replace the PE-PUR Foam in the Recalled Devices to make them safe and healthy for use by Plaintiff and members of the Class but failed to do so until now.

198.   As a direct and proximate result of Philips' breaches of express warranty, Plaintiff and members of the Class have been damaged because they did not receive the products as specifically warranted by Philips. Plaintiff and members of the Class did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for the Recalled Devices.

199.   By reason of the foregoing, Plaintiff and members of the Class seek actual damagesand any other just and proper relief available thereunder for Philips'

failure to deliver goods conforming to their express warranties and resulting breach.

## COUNT XIII

## LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### La. Rev. Stat. Ann. § § 51:1401, *et seq.*

200. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

201. In the alternative, Plaintiff and members of the Class assert they are entitled to reliefand recovery under the Louisiana Unfair Trade Practices Act ("LUTPA") as provided for in La. Rev. Stat. Ann. §§ 51:1401 *et seq.*

202. At all times mentioned herein, Philips engaged in "trade" or "commerce" inLouisiana, as defined by La. R.S. § 51:1402(10), in that they advertised, offered for sale, and soldgoods, property, or services primarily for personal, family, or household purposes, and advertised,solicited, offered for sale, and sold "services," "property," "article[s]," "commodit[ies]," or"thing[s] of value" in Louisiana.

203. LUPTA, La. Rev. Stat. Ann. §51:1405(A) provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce arehereby declared unlawful."

204. For the reasons discussed herein, Philips violated and continues to violate the LUPTA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by La. Rev. Stat. Ann. §§ 51:1401 *et seq.* Philips' acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive, and mislead members of the public, including

consumers acting reasonably under the circumstances, to their detriment.

205.    Philips repeatedly advertised on the labels and packing for the Recalled Devices, on Philips' websites, and through national advertising campaigns, among other items, that the Recalled Devices were safe and fit for human use. Philips failed to disclose the material information that the PE-PUR Foam used in the Recalled Devices, and therefore the Recalled Devices themselves, were unsafe and unfit for human use.

206.    Philips' representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase and use the Recalled Devices without being aware that the PE-PUR Foam used in the Recalled Devices, and therefore the Recalled Devices themselves, were unsafe and unfit for human use. As a direct and proximate result of Philips' unfair and deceptive acts or practices, Plaintiff and the Class Members suffered damages by purchasing the Recalled Devices because they would not have purchased the Recalled Devices had they known the truth, and they received a product that was worthless because it contains unsafe PE-PUR Foam which can cause a number of adverse health effects, including organ failure and cancer.

207.    Philips' deceptive trade practices caused injury in fact and actual damages to Plaintiff and members of the Class in the form of the loss or diminishment of value of the Recalled Devices that Plaintiff and Class Members purchased, which allowed Defendants to profit at the expense of Plaintiff and Class Members. The injuries Plaintiff and Class Members sustained were to legally protected interests. The gravity of the harm of  Philips' actions is significant

and there isno corresponding benefit to consumers of such conduct.

208.   Plaintiff and Class Members seek relief for the injuries they have suffered as a result of Defendants' unfair and deceptive acts and practices, as provided by La. Rev. Stat. Ann. § 51:1409 and applicable law.

209.   Plaintiff and Class Members seek relief for the injuries they have suffered as a result of Defendants' unfair and deceptive acts and practices, as provided by La. Rev. Stat. Ann. § 51:1409 and applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Philips as to each and every count, including:

A.   An order certifying this action and the Class and Subclass requested herein as a class action, designating Plaintiff as the representative of the Class and Subclass, and appointing Plaintiff's counsel as counsel to the Class and Subclass

B.   An order declaring that Philips' actions constitute:

(i)   breach of express warranty;

(ii)   breach of the implied warranty of merchantability;

(iii)   fraudulent misrepresentation;

(iv)   fraud by omission;

(v)   negligent misrepresentation; and

C.   A judgment awarding Plaintiff and members of the Class and Subclass all appropriate damages in an amount to be determined at trial;

D.   A judgment awarding Plaintiff and the Class and Subclass prejudgment and post-

judgment interest, as permitted by law;

E.    A judgment awarding Plaintiff and the Class and Subclass costs and fees,

including attorneys' fees, as permitted by law; and

F.    Grant such other legal, equitable or further relief as the Court may deem   just
and

proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**RON AUSTIN LAW, LLC**

_____
**RON A. AUSTIN (Bar No. 23630)**
**CATHERINE HILTON (Bar No. 27238)**
400 Manhattan Boulevard
Harvey, LA 70058
Telephone: (504) 227-8100
Facsimile: (504) 227-8122
e-mail: raustin@ronaustinlaw.com
chilton@ronaustinlaw.com

*Counsel for the Plaintiff*